UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SERENITY JORDAN,

     Plaintiff                   Civil Action No.  17-13636

v.                           HON. ARTHUR J. TARNOW
                              U.S. District Judge
                              HON. R. STEVEN WHALEN
COMMISSIONER OF SOCIAL      U.S. Magistrate Judge
SECURITY,

     Defendant.

_____/

## **REPORT AND RECOMMENDATION**

Plaintiff Serenity Jordan ("Plaintiff") brings this action under 42 U.S.C. § 405(g) challenging a final decision of Defendant Commissioner ("Defendant") denying her application for Disability Insurance Benefits ("DIB") under the Social Security Act.  Both parties have filed summary judgment motions which have been referred for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).  For the reasons set forth below,  I recommend that Defendant's Motion for Summary Judgment [Docket #14] be GRANTED and that Plaintiff's Motion for Summary Judgment [Docket #12] be DENIED.[1]

_____

[1]

Plaintiff's motion for summary judgment and response briefs fail to comply with the Court's Local Rule on type size, which requires all text and footnotes be no smaller than 14-point type size. E.D. Mich. LR 5.1(a)(3).  Future non-compliance will result in pleadings being stricken.

## PROCEDURAL HISTORY

On March 26, 2014, Plaintiff filed an application for DIB, alleging an onset of disability date of February 10, 2011 (Tr. 188).  After the initial denial of the claim, Plaintiff filed a  request for an administrative hearing, held on May 4, 2016 in Flint, Michigan before Administrative Law Judge ("ALJ") Michael R. Dunn (Tr. 47).  Plaintiff, represented by attorney Lori Selvedge, testified (Tr. 10, 55-77), as did Vocational Expert ("VE") Timothy Shaner (Tr. 78-83).  On June 29, 2016, ALJ Dunn found Plaintiff not disabled (Tr. 10-24). On September 18, 2017, the Appeals Council denied review (Tr. 1-3).  Plaintiff filed for judicial review of the final decision in this Court on November 8, 2017.

## BACKGROUND FACTS

Plaintiff, born December 24, 1981 was 34 when ALJ Dunn issued his decision (Tr. 24, 188).  She completed 12th grade and worked previously as a direct care worker (Tr. 220). Her application for benefits alleges disability due to anxiety and back problems (Tr. 219).

### A.  Plaintiff's Testimony

 *Plaintiff's counsel prefaced his client's testimony by noting that she planned to submit pictures Plaintiff had taken of herself documenting a not yet diagnosed condition, noting that "a picture is worth a million words. . . ." (Tr. 51-52).  The ALJ responded that he would receive Plaintiff's testimony "as to the frequency and the consequences to her ability to function," but that it was "inappropriate for a Judge to . . . think that we have medical training [and] make diagnoses without the assistance of the physicians who are making the diagnoses" (Tr. 52).  He declined to accept the additional evidence consisting of pictures taken by Plaintiff documenting her own condition (Tr. 52).  The ALJ also requested that counsel raise objections to the VE's testimony at the hearing, noting that objections to the vocational testimony and/or additional vocational evidence brought*

*subsequent to the hearing would potentially require "another hearing"* (Tr. 54). *The ALJ proposed that instead, counsel bring her own vocational expert to the hearing to which counsel responded "okay"* (Tr. 54).

Plaintiff then offered the following testimony:

She stood 5' 3" and weighed around 180 (Tr. 55). She was married, with an 18-year-old daughter and four-year-old son (Tr. 56). She lived with her husband, children, and mother (Tr. 56). She had a driver's licence but rarely drove (Tr. 56). Due to anxiety, she was required to take Xanax before getting into a vehicle (Tr. 57). She was able to read and write (Tr. 57).

Plaintiff had received a now lapsed certificate for direct care work (Tr. 57). Her former work was performed both at a nursing home and in people's homes, and required patient transfers, cooking, cleaning, bathing, dressing, giving medication, and driving clients to doctors' appointments and to work (Tr. 58). She left work in February, 2011 for a maternity leave (Tr. 59).

*The ALJ then asked Plaintiff to testify as to her limitations and pain* (Tr. 60).

Plaintiff experienced intermittent low back pain radiating into the right hip and thigh (Tr. 60). She also experienced bruising from the bottom half of her torso to her calves (Tr. 61). The bruises caused pain while walking, sitting, and performing other functions (Tr. 61). While the bruises were forming she experienced "bee sting" type pain (Tr. 61). She had been prescribed steroids and Norco for the pain, adding that the medication did not make her "feel very good" (Tr. 61). She generally experienced bruising after finishing a menstrual cycle (Tr. 62).

-3-

In addition to the physical problems, Plaintiff experienced anxiety and auditory hallucinations (Tr. 63).  As a result of anxiety, she sometimes became physically ill during a panic attack (Tr. 63).  Xanax improved the condition (Tr. 63).  Panic attacks were characterized by hyperventilation and crying (Tr. 64).  Panic attacks were triggered by leaving the house and riding in a vehicle (Tr. 65).  She had experienced panic attacks subsequent to a car accident in which she was not injured but nonetheless traumatized (Tr. 65).

The auditory hallucinations consisted of voices speaking softly which she believed were her "other personalities" (Tr. 66).  They did not say disturbing things or give her directions to harm others (Tr. 66).  Some of the voices were of deceased family members and she generally found the voices comforting (Tr. 66).  On occasions where she heard five or six people speaking at once, the voices became "overwhelming" and "aggravating" (Tr. 67).  She currently received individualized mental health therapy (Tr. 67).  Mood swings were quelled with the use of Lamictal (Tr. 68).  She denied medication side effects from the psychotropic medication (Tr. 69).

In the year before the hearing, Plaintiff sought emergency treatment on two occasions for bruising and back pain (Tr. 69).  She smoked but did not drink or use illicit drugs (Tr. 70).  Her memory was "pretty good" but she "lost time" for a few minutes when she was hallucinating (Tr. 71).  She hallucinated approximately once a week (Tr. 72).

In response to questioning by her attorney, she stated that she also saw individuals who had "passed" (Tr. 74).  She experienced painful bruising continually, noting that as some healed she developed new ones (Tr. 75).  The pain from the bruises was "excruciating" (Tr. 76).  On a scale of 1 to 10, her pain level was a 6 as long as she took steroids and refrained from excessive moving (Tr. 76).  She opined that her physical conditions would require her

-4-

to miss work three to five days a week (Tr. 77).

### B.   Medical Evidence

#### 1.   Records Related to Plaintiff's Treatment

 February, 2011 records state that Plaintiff "became very upset" when refused an "off work" note without an examination (Tr. 543).  A Holter monitor report was unremarkable (Tr. 588).  July, 2011 treating records note that Plaintiff was being treated for back pain with osteopathic manipulation (Tr. 310, 540).  An echocardiogram from the same month was negative for abnormalities (Tr. 309).   Plaintiff reported that she had "cut down" on her Vicodin use since finding out she was pregnant (Tr. 572).  In October, 2011, Plaintiff reported that she was "excessively worried about going back to work" (Tr. 535).

January, 2012 records note low back pain secondary to poor conditioning and obesity (Tr. 532).  February, 2012 records note good results from osteopathic manipulation of the hip (Tr. 530).  In March, 2012, Plaintiff was advised to lose weight and exercise (Tr. 591).  May, 2012 records note an unremarkable echocardiogram and Holter monitor reading (Tr. 455, 522-524).  She was diagnosed with generalized anxiety and postpartum depression (Tr. 455).  She reported good results from Celexa (Tr. 457).  The following month she requested an "off work" note (Tr. 459).  In August, 2012, Lawrence Gooss, D.O. stated that he did not believe that Plaintiff had bipolar disorder (Tr. 462).  She refused a psychiatric consult (Tr. 462).  The following month, Plaintiff reported depression, anxiety, and agoraphobia (Tr. 464).   In December, 2012, Plaintiff reported that she had recently attacked her husband with a knife (Tr. 472).  She reported that she took Xanax on an as needed basis and used marijuana daily (Tr. 472).  She was advised that her daily marijuana use was complicating both her diagnosis and treatment (Tr. 474).

February, 2013 records note a normal affect and mood (Tr. 476).   March, 2013 gynecological records note diagnoses of pelvic inflammatory disease, anxiety, and depression (Tr. 305).   The following month, Plaintiff requested a hysterectomy to end severe menorrhagia (Tr. 298, 483).

March, 2013 psychological intake records note Plaintiff's report of a good relationship with her mother, son, daughter, and husband (Tr. 622).   She reported that as of February, 2011, she reported traumatizing flashbacks of a previous car accident (Tr. 627).   She reported good relationships with friends despite ongoing anxiety and fear of car travel (Tr. 628).   She identified herself as a "spiritist" (Tr. 629).   She reported that she heard the voices of an older women, young boy, and young woman and experienced visual hallucinations as well  (Tr. 634, 642).   She exhibited mood changes during the interview (Tr. 634).   She denied health or safety concerns (Tr. 632).   She identified as a "stay at home mom" (Tr. 639).   She was well groomed and appropriately dressed (Tr. 639).   H. Khan, M.D. noted that she was pleasant and cooperative with goal directed speech, an anxious affect, average intelligence, and fair insight and judgment (Tr. 645).   He assigned her a GAF of 49[2] (Tr. 646).

June, 2013 notes related to treatment for an insect bite reflect a normal mood, affect, gait, and station (Tr. 296). July, 2013 counseling records note that Plaintiff was alert and oriented (Tr. 680).   August, 2013 records note "poor compliance and follow-up" related to recommendations for further blood work and treatment for pelvic pain (Tr. 290-291).   The notes state that previous blood testing had been normal (Tr. 289).   October, 2013 counseling records note that Plaintiff was alert, oriented, dressed neatly, and had a steady gait and stable

---

[2]

A GAF of 41 to 50 indicates "[s]erious symptoms ... [or] serious impairment in social, occupational, or school functioning," such as inability to keep a job *Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders* (4thed.2000)("*DSM-IV-TR*"), 34.

moods (Tr. 675).  She was assigned a GAF of 60[3]  (Tr. 676).

In January, 2014, Plaintiff requested and received Tramadol, but treating notes state that she refused other recommended courses of treatment (Tr. 288-289).  The notes state that blood testing done in response to Plaintiff's report of bruising had been normal (Tr. 289).  Later the same month she reported hip swelling and bruising (Tr. 284).  She was prescribed Vicodin (Tr. 284, 499).  February, 2014 records by Jennifer Lawhorn, D.O. state that Plaintiff's chronic bruising was unexplained by objective testing (Tr. 271).  She recommended platelet aggregation studies (Tr. 271). The same month Plaintiff received a first dose of Lupron for severe menorrhagia (Tr. 315).  Plaintiff sought emergency treatment the same month for back and abdominal pain (Tr. 328).  An examination was unremarkable (Tr. 328).  She denied the use of drugs except for marijuana (Tr. 329).

The following month, Plaintiff reported continued bruising but noted that all testing had been normal (Tr. 274, 325).  She also reported lower back pain with tingling in her right leg (Tr. 274).  She denied muscle weakness (Tr. 274).  Counseling records note stable moods and that she was "alert and oriented" with a steady gait and "no evidence of psychosis" (Tr. 669).  She reported that her medication was helping her condition (Tr. 671).  April, 2014 records state that her pain was 70 percent better after taking Lupron and that the bruising had resolved (Tr. 316).  An ultrasound was unremarkable (Tr. 316, 606).  She nonetheless opted to proceed with a hysterectomy (Tr. 316).

Surgical records from the following month state that a bilateral salpingectomy was performed without complications (Tr. 388-391).  June, 2014 records state that Plaintiff was advised to "wean" narcotics (Tr. 396).  Counseling records from the same month note stable

---

[3]A GAF score of 51 to 60 indicates moderate symptoms (occasional panic attacks) or moderate difficulty in social, occupational, or school functioning.  *DSM-IV-TR* at 34.

moods (Tr. 664).  She was assigned a GAF of 60 (Tr. 666).  July, 2014 records state that all testing for a blood disorder had been negative (Tr. 323).  The following month, Plaintiff's request for Percocet was refused (Tr. 332, 383, 410, 611).  Treating notes state that she had not complied with recommendations for platelet aggregation studies (Tr. 334).  Plaintiff reported that her bruises had returned (Tr. 370).  Counseling records from November, 2014 note a steady gait and "fairly stable" moods (Tr. 660).

In January, 2015, Plaintiff reported that her hip problems correlated with the bruising (Tr. 425).  Plaintiff's request for narcotics was again denied (Tr. 427-428).  She was told that there there was "no definitive reason to treat [] pain with narcotics and bruising is not a reasons to start narcotics" (Tr. 428, 513).  Later the same month, hematologist Jennifer Lawhorn, D.O. reported a breakdown in the doctor patient relationship, noting that after Plaintiff was again advised to seek treatment by bleeding disorder specialists, she demanded narcotics then became disruptive when her request was refused (Tr. 322, 414-415).  The following month, Plaintiff was advised to use compression stockings for the lower extremity bruises (Tr. 419, 596).  Counseling records from the same month note Plaintiff's report that she was doing well with stable moods (Tr. 656).  She appeared alert and oriented (Tr. 656).

May, 2015 psychiatric medication review records note Plaintiff's denial of significant depression, irritability, or anxiety on a day to day basis (Tr. 444, 650).  She reported auditory hallucinations consisting of voices of her other "personalities" which became louder when she was upset or in physical pain (Tr. 444).  M. Golboch noted a slightly hypomanic mood but appeared otherwise physically and mentally unremarkable (Tr. 444).  Plaintiff was assigned a GAF of 55 (Tr. 447, 653).

-8-

A March, 2016 CT of the lumbar spine showed a disc herniation at L4-L5 "with minimal mass effect" (Tr. 711).  In April, 2016, Rebecca Walker, LLPC completed a mental health questionnaire, noting diagnoses of bipolar, Post Traumatic Stress Disorder ("PTSD"), and borderline personality disorder with symptoms of depression, anxiety, sleeping problems, and irritability (Tr. 708).  She found that Plaintiff experienced difficulties in concentration, hallucinations, and easy distractibility (Tr. 708).  She noted "persistent irrational fear" of an "object, activity, or situation" resulting in "a compelling desire to avoid" the same (Tr. 709).  She noted "recurrent obsessions or compulsions, poor memory, hostility and irritability (Tr. 709).  She concluded that Plaintiff had "depression and anxiety that impair her daily functioning" (Tr. 709).  She found moderate restriction in activities of daily living, social functioning, and concentration, persistence, or pace along with moderate episodes of deterioration of decompensation in work or a work-like setting (Tr. 710).  She found that Plaintiff would be expected to miss work four days a month or more (Tr. 710).

## 2.  Non-Treating Records

In June, 2014, Thomas T.L.Tsai, M.D. performed a non-examining review of the treating and consultative records on behalf of the SSA, finding insufficient evidence of a mental disorder (Tr. 90).

In October, 2015, Michael Geoghegan, D.O. performed a consultative physical examination on behalf of the SSA, noting Plaintiff's report of chronic lower back pain with difficulty walking and performing self care chores (Tr. 686).  She did not require the use of a walker (Tr. 686).  She reported that she was able to drive by herself (Tr. 686).

Dr. Geoghegan observed a full range of lower back motion, full motor strength, and a normal gait (Tr. 688).  He found that Plaintiff could lift up to 50 pounds occasionally and 20 frequently; walk for up to 30 minutes at a time; stand for one hour; and sit for two (Tr.

690).  He found that Plaintiff could sit for a total of seven hours in an eight-hour work-day,

stand for four, and walk for two (Tr. 690).  He limited her to frequent manipulative activity

and pushing (Tr. 691).  He found that she could climb occasionally and perform all other

postural activity frequently (Tr. 692).  He precluded work involving unprotected heights but

found that she could work in all other environmental conditions on a frequent basis (Tr. 693).

He did not find additional limitations (Tr. 694).

The following month, Marianne Goergen, Psy.D. performed a consultative

psychological examination on behalf of the SSA (Tr. 697-703) noting Plaintiff's report of

depression characterized by sleep disturbances, crying jags, irritability, and a suicide attempt

two-and-a-half years earlier (Tr. 697).  She also alleged panic attacks three to five times a

month (Tr. 697).  She reported multiple personalities (Tr. 697).  Plaintiff stated that she

needed to move around due to discomfort from the bruising (Tr. 699).  Dr. Goergen

diagnosed her with dissociative identity disorder, depression, and a panic disorder (Tr. 701).

Dr. Goergen found moderate difficulty in the ability to carry out complex instructions and

marked difficulty making complex judgments (Tr. 704). She found moderate difficulty in the

ability to interact with the public, supervisors, and coworkers and marked limitation in the

ability to respond appropriately to changes in a routine work setting (Tr. 705).

### C.   Vocational Expert Testimony[4]

VE Shaner classified Plaintiff's past work as a home attendant as semiskilled and

exertionally medium (heavy as performed)[5]  (Tr. 240).  The ALJ then posed the following

---

[4]The evidence submitted post-hearing regarding the vocational findings is
discussed in the analysis of the Report.  *See below.*

[5]

20 C.F.R. § 404.1567(a-d) defines *sedentary* work as "lifting no more than 10 pounds
at a time and occasionally lifting or carrying articles like docket files, ledgers, and small

question, taking into account Plaintiff's age, educational level, and past work:

> Assume a worker capable of light exertional activity . . . . Our worker can push and pull as much as I've indicated can be lifted and carried. Can frequently climb ramps and stairs. Occasionally climb ladders and scaffolds. Frequently balance, stoop, crouch, and crawl. Our worker must avoid concentrated exposure to pulmonary irritants. Within those parameters, could such a worker perform the claimant's past work as you have described it? (Tr. 80).

The VE testified that the individual would be unable to perform the past relevant work as a home attendant but could perform the exertionally light work of a cashier (1,100,000 positions in the national economy); inspector (136,000); and laundry worker (90,000) (Tr. 80).

The VE testified that if the hypothetical restrictions were amended to limit the individual to "simple, routine, and repetitive unskilled tasks . . . . free of fast paced production requirements, with few, if any, work place changes;" "simple work related decisions;" "not more than occasional interaction with supervisors and coworkers [with] no interaction with the public;" avoidance to "exposure to upprotected heights and hazardous machinery;" and, "[t]he work should not require the operation of a motor vehicle as part of the job duties" (Tr. 80), the cashier position would be eliminated but the other two job findings would not be affected (Tr. 81). The VE testified that if the same individual were limited to sedentary work, she could perform the job of a packager (74,000); inspector (14,000); and assembler (44,000) (Tr. 81).

The VE testified that if the individual were off task more than 20 percent of the day due to "the distracting nature of pain, difficulty focusing, and concentrating, need to take

---

tools; *light* work as "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds;" *medium* work as "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds;" and that exertionally *heavy* work "involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds.

[unscheduled] breaks" or, were required to miss three or more days of work each month, all competitive work would be precluded (Tr. 81-82). The VE stated that his testimony was consistent with the information found in the Dictionary of Occupational Titles ("DOT") and many years experience as a vocational counselor (Tr. 82). In response to questioning by Plaintiff's counsel, the VE stated that his job numbers were based on fourth quarter, 2015 reports from the Department of Labor, Bureau of Labor Statistics, Department of Commerce, and the Census Bureau (Tr. 83).

### D. The ALJ's Decision

Citing the medical records, ALJ Dunn determined that Plaintiff experienced the severe impairments of "degenerative disc disease of the lumbar spine, bipolar disorder, post-traumatic stress disorder, borderline personality, asthma, lipodermatosclerosis, prupura, [and] panniculitis " but that none of the conditions met or medically equaled an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (Tr. 12-13). The ALJ found that Plaintiff experienced mild limitation in activities of daily living and moderate limitation in social functioning and concentration, persistence, or pace (Tr. 13). The ALJ found that Plaintiff retained the residual functional capacity ("RFC") to perform exertionally light work with the following restrictions:

> [P]ushing and pulling as much as lifting and carrying; frequent climbing of ramps and stairs; occasional climbing of ladders and scaffolds; frequent balancing, stooping, crouching, kneeling and crawling; must avoid exposure to pulmonary irritants; only simple routine and repetitive unskilled tasks . . . free of fast-paced production requirements with few if any work place changes; nothing more than simple work related decisions required; no more than occasional interaction with supervisors and co-workers and no interaction with the public; must avoid unprotected heights and hazard machinery; work should not require operation of a motor vehicle (Tr. 14).

Citing the VE's testimony, the ALJ found that Plaintiff could perform the light, unskilled work of a inspector and laundry worker (Tr. 22, 81).

The ALJ discounted the allegations of disability, noting that Plaintiff's report of heart palpitations was undermined by a normal echocardiogram (Tr. 15).  He cited Dr. Goose's normal phsycial and psychological evaluation (Tr. 16).  He also cited Dr. Khan's psychiatric finding that Plaintiff experienced anxiety but that the rest of the examination was unremarkable (Tr. 16).  The ALJ noted that Plaintiff repeatedly declined to undergo platelet function testing (Tr. 18).  He cited Dr. Black's January, 2015 records stating that Plaintiff became disruptive and demanded narcotics during an examination (Tr. 18).  He noted that as of May, 2015, Plaintiff's psychological condition was deemed stable with medication (Tr. 18).  He cited Dr. Geoghegan's consultative finding that Plaintiff was capable of lifting up to 50 pounds (Tr. 18).

The ALJ overruled the post-hearing objections by Plaintiff's representative to the vocational testimony (Tr. 22-24).  He noted that the objection to the vocational testimony regarding the position of assembler was moot given that the job was not included in the final decision (Tr. 23).  He noted that VE Shaner was "a fully qualified vocational expert" as evidenced by his submission of a curriculum vitae along with his findings as to Plaintiff's past relevant work (Tr. 23).  He disputed the objection that VE Shaner had relied only on the DOT in making the job findings, noting that in fact, the VE relied on several sources in making his job findings (Tr. 23).  The ALJ noted that the VE stated the multiple sources of his job findings (Tr. 24).  The ALJ denied the request for a supplemental hearing , noting that the attorney representing Plaintiff at the hearing "had an opportunity to present evidence, raise objections, and cross-examine the vocational expert" (Tr. 10).

## STANDARD OF REVIEW

The district court reviews the final decision of the Commissioner to determine whether it is supported by substantial evidence.  42 U.S.C. §405(g); *Sherrill v. Secretary of*

*Health and Human Services,* 757 F.2d 803, 804 (6ᵗʰ Cir. 1985).  Substantial evidence is more than a scintilla but less that a preponderance.  It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (*quoting Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, S. Ct. 206, 83 L.Ed.126 (1938)).  The standard of review is deferential and "presupposes that there is a 'zone of choice' within which decision makers can go either way, without interference from the courts." *Mullen v. Bowen,* 800 F.2d 535, 545 (6ᵗʰ Cir. 1986)(en banc).  In determining whether the evidence is substantial, the court must "take into account whatever in the record fairly detracts from its weight." *Wages v. Secretary of Health & Human Services*, 755 F.2d 495, 497 (6ᵗʰ Cir. 1985).  The court must examine the administrative record as a whole, and may look to any evidence in the record, regardless of whether it has been cited by the ALJ. *Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6ᵗʰ Cir. 1989).

## FRAMEWORK FOR DISABILITY DETERMINATIONS

Disability is defined in the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). In evaluating whether a claimant is disabled, the Commissioner is to consider, in sequence, whether the claimant: 1) worked during the alleged period of disability; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of an impairment listed in the regulations; 4) can return to past relevant work; and 5) if not, whether he or she can perform other work in the national economy.  20 C.F.R. §416.920(a).  The Plaintiff has the burden of proof at steps one through four, but the burden shifts to the Commissioner at

-14-

step five to demonstrate that, "notwithstanding the claimant's impairment, he retains the residual functional capacity to perform specific jobs existing in the national economy." *Richardson v. Secretary of Health & Human Services,* 735 F.2d 962, 964 (6th Cir.1984).

## ANALYSIS

Plaintiff makes two arguments for remand.  Her first argument pertains to her objections raised in a post-hearing brief and accompanying exhibits by another vocational expert. *Plaintiff's Brief,* 4-12, *Docket #12,* Pg ID 757.  She argues second that the ALJ erred by failing to assign a specific weight to Dr. Goergen's consultative opinion or address all of her findings.  *Id.* at 17-23.

### A.  The ALJ's Consideration of the Post-Hearing Arguments and Exhibits

#### 1.  The Post-Hearing Memorandum and Exhibits

On May 23, 2016, non-attorney Andrew Youngman ("Youngman") submitted objections to Timothy Shaner's ("Shaner's") vocational testimony, faulting Shaner's reliance on the DOT for his job findings (Tr. 245-268).  Youngman also submitted exhibits, first a 2014 letter by a U.S. Department of Labor division stating the  DOT was "no longer in use by the Bureau of Labor Statistics" and that it was "regarded as obsolete" because it was based in large part on research conducted three decades earlier (Tr. 252-253).  He also submitted a 1999 article by Occupational Outlook Quarterly extolling the advantages of O*NET, a newer occupational base, over the DOT (Tr. 255-261).  He  included a 2007 letter by the Assistant Commissioner in the Office of Occupational Statistic stating that "we do regard [the DOT] as obsolete (Tr. 263).   Youngman's last exhibit consists of an opinion by a  vocational expert, Paula F. Santagati, ("Santagati") stating that "the training and probationary period" for even unskilled work would require more than occasional interaction

with co-workers and supervisors[6] (Tr. 266).  Her curriculum vitae states that she worked for "nearly 20 years" as a vocational rehabilitation counselor (Tr. 268).

### 2.  Plaintiff's Current Argument Regarding the Post-Hearing Submissions

Plaintiff, now represented by counsel, argues that ALJ erroneously relied on Shaner's hearing testimony to meet his burden at Step Five without "adequately addressing" the post-hearing objections to the vocational testimony.  *Plaintiff's Brief* at 4-6.  She argues that the ALJ failed to fulfill his duty to address objections to a VE's opinion as stated in the SSA's Hearings, Appeals, and Litigation Law Manual ("HALLEX") § I-2-6-74(B).  *Id.* at 6-8.  She contends that the ALJ failed to discuss Santagati's finding that (1) the social limitations set forth in the RFC would preclude performance of unskilled work, and (2) the jobs of inspector and laundry worker are no longer "unskilled" jobs.  *Id.* at 9-12.

### 3.  The ALJ Provided Ample Reasons for Denying the Post-Hearing Objections

Plaintiff's claim that the ALJ did not consider all of her objections to Shaner's testimony is not well taken.  Contrary to Plaintiff's argument that the ALJ did not comply with HALLEX § I-2-6-74(B)(requiring ALJ to rule on objections to vocational testimony) the ALJ satisfied both its substantive and procedural requirements.[7]

As a threshold matter, HALLEX § I-2-6-74 requires only that the ALJ "[r]ule on any objection."  The ALJ pointed out that his reliance on the DOT information and Shaner's

---

[6]The hypothetical question forming the basis of the ultimate RFC limits Plaintiff to occasional interaction with co-workers and supervisors (Tr. 14, 80).

[7]

Section  I-2-6-74 requires in relevant part that the ALJ must "Ask the VE to confirm his or her impartiality, expertise, and professional qualifications," "Ask the claimant and the representative whether they have any objection(s) to the VE testifying," and "Rule on any objection(s) which may be addressed "on the record during the hearing, in narrative form as a separate exhibit, or in the body of his or her decision."  *Id.*

testimony was required by the Social Security Regulations (Tr. 23). By itself, the ALJ's well supported determination that the objections were "foreclosed by regulation" constitutes adequate grounds for denial of all of the objections raised by Youngman (Tr. 23). Aside from acknowledging the objections and ruling on them, nothing in § I-2-6-74 suggests that he was required to provide a lengthy rationale for denying the objections.

Notwithstanding, the ALJ devoted over a page of the administrative decision to the post-hearing submissions (Tr. 22-24). First, he acknowledged that Youngman objected to the following aspects of Shaner's testimony: (1) the job numbers (2) the incidence of jobs (3) the testimony that the jobs in question were unskilled (4) the jobs' need for greater than occasional interaction with supervisors and coworkers during the probationary period and (5) the job of assembler was not an unskilled position (Tr. 23 *citing* 245-246).

The ALJ then provided ample reasons to deny the objections. In adopting Shaner's testimony over the evidence submitted by Youngman, the ALJ noted that Shaner was a qualified vocational expert and had assisted in Social Security claims for many years (Tr. 23). Although by itself not dispositive of whether Shaner was the "better" source, Shaner's curriculum vitae states that he has worked as a Vocational Rehabilitation Consultant for over 30 years (Tr. 239), while Santagati reports less than 20 years of experience (Tr. 268). As to his partial reliance on the information found in the DOT, the ALJ noted that he was required by regulation to take administrative notice of "several sources of reliable job information, including the DOT" (Tr. 23)(*citing* 20 C.F.R. § 404.1566(d)). He noted further that under the same statute the use of a vocational expert was permitted in determining whether the claimant was disabled (Tr. 23); § 404.1566(e).

The ALJ noted that as to the testimony concerning the jobs' skill levels, the applicable regulations provide for the skill requirements of unskilled, semiskilled, and skilled and did

-17-

"not correspond directly with the "reasoning levels" listed in the DOT (Tr. 23). He stated that his reliance on the DOT was coupled with Shaner's testimony as required by SSR 00-4p, 2000 WL 1898704, at *2 (December 4, 2000)(while ALJs "rely primarily on the DOT," "[n]either the DOT nor the VE [] evidence automatically 'trumps' when there is a conflict."). Noting that he was required to consider the DOT under Social Security Rulings and regulations, he determined that the argument that the DOT information was improperly used was "foreclosed by regulation" (Tr. 23). In response to Youngman's contention that the job numbers were unreliable, the ALJ pointed out that Shaner's job numbers, drawn from his professional experience as well as government sources, were "by their very nature reasonable estimates . . ." rather than exact numbers[8] (Tr. 23). Finally, the ALJ observed that Plaintiff's attorney at the hearing "had an opportunity to present evidence, raise objections, and cross-examine the [VE] at the hearing" (Tr. 24). He noted that Shaner "testified in detail" as to the job number sources and conflicts with the DOT and that "conflicts with the [DOT] regarding unskilled versus skilled employment were sufficiently explained at the time of hearing" (Tr. 24). The ALJ noted that Youngman's objection that the job of "final assembler" was not unskilled was mooted by the fact that the position (offered by Shaner in response to hypothetical limitations ultimately rejected by the ALJ) was not listed among the job findings in the administrative opinion (Tr. 23, 247).

Plaintiff's claim that the ALJ did not provide an adequate response to Santagati's opinion that the training period for the jobs in question would require more occasional interaction with others likewise does not provide grounds for remand. The ALJ noted that

---

[8]

To the extent that Youngman challenges the job numbers, Shaner testified that his job numbers were based on fourth quarter, 2015 reports by the Department of Labor, Bureau of Labor Statistics, Department of Commerce, and the Census Bureau (Tr. 83).

Shaner's testimony (given in response to a hypothetical including restriction to jobs did not require more than occasional interaction) was based not only on the DOT but Shaner's own professional experience[9] (Tr. 23).  Plaintiff's argument that the ALJ failed to provide an adequate discussion of Santagati's finding regarding a limitation to "occasional" interaction with other during a work probationary/training period should also be rejected.  First, the ALJ acknowledged the "occasional" interaction objection (Tr. 23).  He then went on to note that Shaner's testimony included his basis for the job findings and that counsel representing Plaintiff at the hearing had not objected to his qualifications (Tr. 23).

Contrary to Plaintiff's argument that the ALJ ought to have provided a more explicit rebuttal to Santagati's "occasional" findings, Santagati's submission did not address Shaner's discrete job findings of inspector or laundry worker but rather (in what appears to be a form statement) offered a blanket statement that "the limitation of occasional interaction with coworkers and supervisors precludes all work as the training and probationary period for any job would require more than occasional interaction with co-workers and supervisors" (Tr. 267).  By way of example, she cited the jobs of dishwasher and house cleaner, but again, did not state how the "occasional" limitation would affect the jobs of inspector or laundry worker (Tr. 267).  Aside from Santagati's generalized statement regarding the "occasional" limitation, she offered no challenge to the two job findings by Shaner.  It is worth repeating that Plaintiff's counsel at the hearing did not challenge Shaner's testimony as to the skill

---

[9]

Santagati  did not mention or offer any opinion concerning the jobs of either "Inspector and Hand Packager" (DOT Code 559.687-074) or "Shaker, Wearing Apparel" (361.687-026) as cited by Shaner.  Based on the DOT's description, it is difficult to discern how either job would require Plaintiff to interact with others for more than one third of the workday during the "training" period, or how either position could be considered anything but unskilled.

-19-

level of the jobs or that Plaintiff would be required to interact more than occasionally with others during the training period (Tr. 82-83).  Given the absence of actual rebuttal concerning the inspector and laundry worker findings, the ALJ did not err in declining to provide a more detailed explanation for rejecting Santagati's findings.  Once again, while Plaintiff argues that the ALJ did not address the statements by Department of Labor officials indicating that the DOT was obsolete, the ALJ pointed out that because he was required by regulation to consider VE testimony based on the DOT, he was foreclosed from rejecting the DOT as a source of vocational information (Tr. 23).

Because Youngman's objections were more than adequately addressed by the ALJ, a remand on this basis is not warranted.

### B.  The Discussion of Dr. Goergen's Findings is Well Supported and Explained

Plaintiff also argues that the ALJ's analysis of Dr. Goergen's November, 2015 consultative psychological findings was "legally deficit." *Plaintiff's Brief* at 17 (*citing* 20 C.F.R. § 404.1527(c).[10]  Plaintiff claims that "it is literally impossible to tell *what* weight Dr. Goergen's opinion carried in the ALJ's mind when issuing his decision." *Plaintiff's Brief* at 20.  (Emphasis in original).  She claims that without explanation, the RFC omits some of the limitations found by Dr Goergen .  *Id.*

Section § 404.1527 (c) states in relevant part that the Commissioner "will evaluate every medical opinion" received.  While examining or consultative sources are not entitled to the same weight as a treating source for claims filed prior to March 27, 2017, the ALJ must consider all of the transcripts medical opinions.  *Id.*

---

[10]Although Plaintiff states that he is relying on § 404.1527(d), in fact that subsection pertains to determinations "reserved to the Commissioner." Rather, his argument appears to be based on § 404.1527(c).

Plaintiff's claim that the ALJ either failed to grasp the severity of Dr. Goergen's findings or failed to articulate the weight he accorded the assessment is contradicted by the ALJ's finding, which speaks for itself:

> Dr. Goergen, an examining source, opines the claimant has marked limitations with making judgments on complex work-related decision[s] and responding appropriately to usual work situations and to changes in a routine work setting; Dr. Goergen opined the claimant had moderate limitations in . . . understanding and carrying out complex instructions; interacting appropriately with the public, supervisors, and co-workers []. That opinion is consistent with the need for a low stress, working environment with few, if any changes . . . no fast-paced production requirements and limitations with respect to social interaction (20).

Consistent with this assessment, the RFC limits Plaintiff to "simple routine and repetitive unskilled tasks," no "fast-paced production requirements," "few if any work place changes," only "simple work related decisions," "no more than occasional interaction with supervisors and co-workers" or the public, no "unprotected heights" or hazards, and no "operation of a motor vehicle" (Tr. 14). Plaintiff provides no support for her argument that the ALJ's failure to use the word "weight" in adopting Dr. Goergen's findings provides grounds for remand.

Further, Plaintiff's related argument that the RFC does not reflect Dr. Georgen's finding of "*marked*" limitations in making judgments on complex work-related decisions and responding appropriately to usual work situations and to changes in a routine work setting" is contradicted by the RFC itself, which limits Plaintiff to "low stress" work "with few, if any changes" (Tr. 14). While Plaintiff notes that in the context of the assessment that the term "marked" is defined as "a substantial loss in the ability to function" her argument that a marked limitation is intrinsically disabling stands at odds with case law from this district. *See Hammett v. Commissioner of Social Sec.*, 2017 WL 4003438, at *2 (E.D.Mich. September 12, 2017)("marked difficulties in [] ability to respond appropriately to usual work

situations and to changes in a routine work setting" adequately accounted for by a limitation "to simple, routine tasks with only occasional changes in the work setting"); *Davis v. Commissioner of Social Sec.*, 2015 WL 668035, at *3 (E.D.Mich. February 17, 2015)(same). To the extent that Plaintiff argues that the psychological treating records reflect disabling limitations, the ALJ noted that the treatment records showed that Plaintiff's condition improved with counseling and medication (Tr. 20-21). This is consistent with my own review of the record.

Finally, I note that the record does not overwhelmingly support Plaintiff's claims of either physical or psychological disability. The objective testing has wholly failed to support Plaintiff's claim of cardiac problems. She failed to follow through with testing which presumably would have provided an explanation for or refute her claims of "spontaneous" bruising. The imaging studies of the lumbar spine indicate only mild limitations and do not suggest that she is unable to perform a range of exertionally light work. The treating records stating that she was advised to use conservative measures to improve her health such as dietary changes and exercise also undermine her claim that she is unable to perform light work. As to the psychological limitations, Plaintiff reported one incident in which she attacked her husband. However, treating notes created before and after the event indicate that she maintained good relationships with her family and friends and experienced improvement in mood and focus (by her own account to treating sources) with psychotropic medication.

Because the ALJ's determination was well explained and within the "zone of choice" accorded the administrative fact-finder, it should be remain undisturbed. *Mullen v. Bowen*, *supra*.

-22-

## CONCLUSION

For the reasons stated above, I recommend that Defendant's Motion for Summary Judgment [Docket #15] be GRANTED and that Plaintiff's Motion for Summary Judgment [Docket #12] be DENIED.

Any objections to this Report and Recommendation must be filed within 14 days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of HHS,* 932 F.2d 505 (6th Cir. 1991); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of HHS,* 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir. 1987).

Within 14 days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than 20 pages in length unless by motion and order such page limit is extended by the court. The response shall address specifically, and in the same order raised, each issue contained within the objections.


s/ R. Steven Whalen
R. STEVEN WHALEN
UNITED STATES MAGISTRATE JUDGE

Dated: January 28, 2019

-23-

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing document was sent to parties of record on January 28, 2019, electronically and/or by U.S. mail.

<div style="margin-left:40%">

<u>s/Carolyn M. Ciesla</u>
Case Manager to the
Honorable R. Steven Whalen

</div>